DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JOSE REYNA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-2306

[August 26, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Cheryl Caracuzzo, Judge; L.T. Case No. 502015CF004073A.

Kristen A. Kawass of Law Offices of Kawass, P.A., Miami, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Paul Patti, III, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

We reverse convictions for three counts of sexual battery because the trial court abused its discretion in admitting evidence of a collateral crime. We remand for a new trial in which the collateral crime evidence is excluded.

The state charged Jose Reyna with three counts of sexual battery under section 794.011(5)(b), Florida Statutes (2015), by a person eighteen years of age or older upon a person over eighteen. All three counts arose from one encounter; count 1 alleged digital penetration of the victim's vagina, count 2 alleged oral penetration or union with the victim's vagina, and count 3 alleged penile penetration or union with the victim's vagina.

The state timely filed a notice of its intent to offer *Williams*[1] rule evidence pursuant to section 90.404(2)(c), Florida Statutes (2015). The state sought to introduce evidence of a separate incident that occurred in

---

[1] *Williams v. State,* 110 So. 2d 654 (Fla. 1959).

October 2010, described in more detail below. After an evidentiary hearing, the circuit court ruled that the testimony was admissible.

### *The Evidence at Trial*

*The State's Case*

The victim testified that she met appellant through his wife, with whom she worked. She vacationed with the couple and had stayed at their house in a spare bedroom numerous times after socializing with them. Prior to the night of the incident, nothing inappropriate had occurred between her and appellant.

On January 18, 2015, the victim made plans with the wife to socialize. The game plan for the evening was to hang out, have fun, and help the victim forget an unhappy personal matter. The victim went to the Reyna home the evening of the incident with a packed bag because she was planning on staying overnight.

Using her car, the victim drove the Reynas to the Clematis Street area of West Palm Beach. Their first stop was a wine bar, where they ordered food, drinks, and a bottle of wine.

The trio next went to a different bar where they ordered three rounds of drinks, danced, and had a good time. By the time they left, the victim testified that she was "buzzed." Next, the three went to a restaurant, owned by an acquaintance of the Reynas, for more drinks.

After leaving the restaurant, the group returned to the Reyna home. Because the house was being renovated, one of the bedrooms was unavailable. The Reynas took the other bedroom, and the victim prepared to sleep on the couch in the living room. The couch was an L-shaped, sectional couch. Once they arrived at the home, the victim poured herself a glass of red wine from a bottle in the kitchen and sat on the couch. She spilled the wine on her t-shirt and changed into something else. Then she had some tequila.

The victim fell asleep on the couch. The victim was awakened by someone kissing her on the mouth. She testified that

> it was kind of one of those like "What is happening?" Once I opened my eyes, it was dark. Like dark hair, dark skin. It didn't feel familiar. It didn't smell familiar. I mean, if that even—it just felt very strange and very disorienting. I

2

remember thinking—and then once I realized what was happening, I was just like "What are you doing?" It was just such a strange, almost shocking "What are you doing?"

The victim realized that it was appellant. She swatted at him and asked, "What are you doing?" She told him he needed to go back to bed.

The victim described the rest of the night as a series of "flashes." She kept falling back asleep, only to be awakened by different types of touching.

The next time she awoke to appellant kissing her chest, after having unzipped her fleece pullover. She repeatedly swatted at him, asked him what he was doing, and told him, "Go to bed with your wife."

The next thing the victim remembered was that appellant "put his hands down my shorts and began to stick his fingers inside of me." It was uncomfortable and the victim pushed him away to make him stop. At another time, she was awakened by appellant performing oral sex upon her. Concerning the third form of assault, the victim testified that

at some point, he was in front of me and in between my legs. And at some point, I did feel him—I felt him actually put his penis inside of me. . . . [When appellant was] on top of me and actually was having sex with me, I did finally get my feet up on his hips and push him away and say, "No."

The prosecutor asked the victim why she didn't yell or scream during the events on the couch. The victim explained:

I mean, this is—this is my friend. This is somebody that I know. And also it was—I was completely humiliated that his wife was my really good friend. And I didn't want her to know. I didn't—it was just such a—it wasn't even that terribly what I would call violent. It was just so inappropriate and so shocking and so unexpected. I'm not really the type of person that would scream or get that terribly emotional, anyway. But I—I mean, I didn't want [the wife] to know what was going on. And I did not understand why he was doing it.

After the final assault, the victim fell asleep. She woke up the next morning and took a shower. While in the shower, the victim realized that something was wrong. She had abnormal discharge and cramping in her abdomen. She threw her clothes in her overnight bag and left the house.

3

For the rest of the day, the victim hung out at home and reported the incident to no one.

The victim testified that her memories about the incident returned at work the next day. She began panicking but continued working. When she encountered appellant's wife, she did not tell her what had happened and insisted that she was busy with work.

After the victim told her sister about the assault, the victim decided to go to the hospital, where a nurse performed a rape exam and the incident was reported to the police.

Later, the police contacted the victim to participate in recorded, controlled calls with appellant. On the calls, when confronted by the victim, appellant repeatedly said he was sorry, but he also said he had no memory of anything:

> . . . [T]o tell you the truth what I remember is . . . being told to go to bed by [my wife]. And then I—and then I went to bed and then I woke up and I had this massive headache.

At another point in the call he said "I don't remember. And I apologize because seriously, I don't understand. I have to now figure out what the hell's now going on in my head."

The *Williams* Rule Testimony

At the admissibility hearing, the *Williams* rule witness identified herself as a detective at a local law enforcement agency, assigned to a unit that focused on sex crimes. She said she had socialized occasionally with the Reynas.

In October 2010, the witness made plans to attend the "Moonfest" festival on Clematis Street with the Reynas and another person. They met at the Reynas' house for food and drinks before leaving for the festival. On Clematis Street, they danced, talked, and drank "to the point of impairment."

At one of the bars, the witness and appellant were in the back "just talking [and] hanging out." Somehow, they got pushed out the back door into the alley and then the door closed. The door was flush with the wall and there was no handle, so they could not get back into the bar from the alley.

4

The witness and appellant walked to a bench and sat down. They tried to call appellant's wife. Appellant started trying to kiss the witness and said she was beautiful. She protested that appellant was married and pushed him off. At one point, the witness testified that appellant

> leaned over on top of me and started shoving his hand up under my skirt and ended up like touching in my vagina . . . . He just kind of like got on top of me. And then just shoved his hand—it was really quick. He just shoved his hand up my skirt.

Appellant's sudden action ripped her pantyhose. The witness pushed appellant to get out from underneath him and "took off running." She ran to a convenience store and used the phone to call her mother, who came to pick her up. At trial, the witness testified consistently with her testimony at the prior hearing, adding just a few details.

### The Defense Case

Appellant testified at trial. He claimed he had no memory of assaulting the victim. On the night of the incident, he fell asleep on the couch in the living room, which he often did when he had back problems. The next thing he remembered was his wife waking him up and taking him to bed. He said he was completely clothed when his wife came to get him.

The wife testified that she never saw anything inappropriate occur between appellant and the victim. Both Reynas testified that a key point of the evening was to discuss the victim's poor job performance and to alert her that her job was in jeopardy. Both Reynas testified that appellant suffered from a herniated disc and that he took a prescribed medication, Flexeril, after he arrived back at home the evening of the incident

Appellant denied the *Williams* rule witness's allegations. He stated that the witness kissed him once. He said no other sexual contact occurred.

As to the controlled calls, appellant said he was in shock and disbelief. He testified that the victim was a close friend in a fragile state of mind from a breakup over the holidays. He did not know what was going on and he wanted to calm both her and the situation down.

Appellant was convicted of all three crimes. On appeal, he primarily raises the *Williams* rule issue.

5

***The trial court abused its discretion by admitting collateral crime evidence under section 90.404(2)(c) because, under the <u>McLean v. State</u> analytical framework, there were insufficient points of similarity between the charged crime and the collateral crime***

For years, the admissibility of other crimes, wrongs, or acts was evaluated under section 90.404(2)(a), Florida Statutes. The current version of section 90.404(2)(a) provides:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

§ 90.404(2)(a), Fla. Stat. (2020).

This section "restate[d] the Florida law as determined by *Williams v. State*," 110 So. 2d 654 (Fla. 1959). Charles W. Ehrhardt, *Florida Evidence* § 404.9 (2012 ed.). Applying this section of the evidence code, courts were cautious when asked to admit collateral crime evidence in sexual battery cases, so as not to run afoul of the statutory prohibition against admitting such evidence "solely to prove bad character or propensity." *See, e.g.*, *Feller v. State*, 637 So. 2d 911, 916 (Fla. 1994) (addressing *Williams* rule issue in order to offer guidance on retrial, explaining that sexual battery on an underage child is not uniformly admissible under section 90.404(2), and emphasizing that the acts at issue had only two things in common—they involved the same type of offense and both victims were young girls); *Williams v. State*, 621 So. 2d 413, 416 (Fla. 1993) (observing that "because consent is unique to the individual the mere fact that the victim of an unrelated assault did not consent cannot serve as evidence of nonconsent by the victim of the charged offense"); *Frieson v. State*, 512 So. 2d 1092, 1093 (Fla. 2d DCA 1987) (in a sexual battery prosecution, it was error to admit evidence that defendant had committed another sexual battery where only similarity between the two offenses was that both were sexual batteries).

In 2011, the Florida Legislature enacted section 90.404(2)(c), Florida Statutes, applicable when a defendant is charged with a "sexual offense." Ch. 2011-220, § 2, Laws of Fla. Section 90.404(2)(c) provides in relevant part:

> In a criminal case in which the defendant is charged with a sexual offense, evidence of the defendant's commission of other crimes, wrongs, or acts involving a sexual offense is admissible and may be considered for its bearing on any matter to which it is relevant.

§ 90.404(2)(c)1., Fla. Stat. (2018). Subsection 90.404(2)(c)2. defines a "sexual offense" as including the crimes charged in this case.

The wording of section 90.404(2)(c)1. is strikingly similar to that of the previously enacted section 90.402(2)(b)1., which applies in "child molestation" cases. Because of this similarity, courts have applied the admissibility framework of *McLean v. State*, 934 So. 2d 1248 (Fla. 2006), to evidence introduced under 90.404(2)(c), even though *McLean* involved a child molestation case falling under section 90.404(2)(b). *See, e.g., Whisby v. State*, 262 So. 3d 228, 232 (Fla. 1st DCA 2018); Charles W. Ehrhardt, *Florida Evidence* § 404.18 (2012 ed.).

Like the statute at issue in *McLean*, the plain language of section 90.404(2)(c)1. is broad—collateral crime evidence is "admissible and may be considered for its bearing on *any matter* to which it is relevant." § 90.404(2)(c)1., Fla. Stat. (2018) (emphasis added). In *McLean*, the Florida Supreme Court narrowed the broad sweep of section 90.404(2)(b)1. by reading the statute in conjunction with section 90.403, Florida Statutes (2005), which requires that the probative value of relevant evidence be weighed against its potential for unfair prejudice. *McLean*, 934 So. 2d at 1251. The supreme court resolved a due process challenge to section 90.404(2)(b) by applying section 90.403 considerations to ensure that the door is not opened "to introduction of any and all propensity evidence in sexual molestation cases." *Id.*

Central to the section 90.403 analysis mandated by *McLean* is the notion of similarity between the collateral act and the charged offense. In upholding the constitutionality of the statute, the court noted that "[t]he similarity of the collateral act . . . and charged offense is a critical consideration for the trial court in conducting an appropriate weighing under section 90.403." *Id.* at 1259.

The court explained that the similarity between the two acts is important in determining admissibility in two ways:

> First, the less similar the prior acts, the less relevant they are to the charged crime, and therefore the less likely they will be admissible. Second, the less similar the prior acts, the more

7

likely that the probable value of this evidence will be "substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."

*Id.* at 1259 (quoting § 90.403, Fla. Stat.).

*McLean* set forth a non-exclusive list of factors a trial court should consider when determining whether the probative value of previous sexual offenses is substantially outweighed by the danger of unfair prejudice:

> (1) the similarity of the prior acts to the act charged regarding the location of where the acts occurred, the age and gender of the victims, and the manner in which the acts were committed; (2) the closeness in time of the prior acts to the act charged; (3) the frequency of the prior acts; and (4) the presence or lack of intervening circumstances.

*Id.* at 1262.

Since section 90.404(2)(c) was enacted in 2011, several cases have interpreted the statute. For collateral sex crimes to be admissible, courts have applied section 90.404(2)(c) to require significant similarity between the collateral evidence and the charged crime, evidence so similar and specific that it resembles a clear pattern of conduct. This is in contrast to child molestation prosecutions where collateral crime evidence under section 90.404(2)(b) is a common prosecutorial tool. *See Pridemore v. State*, No. 4D19-1555, 2020 WL 4496072 (Fla. 4th DCA Aug. 5, 2020). The law requires greater similarity under 90.404(2)(c) than in child molestation cases because the adult cases can involve defenses—identification and consent—that are not present in crimes against children. Evidence can be more nuanced in adult cases and subject to different interpretations.

For example, in *Whisby*, the First District held that collateral crime evidence was admissible where it occurred less than twenty-four hours from the charged crime and in an "almost identical fashion." 262 So. 3d at 232. In both instances, the defendant forced the victim into his car at gunpoint, drove her to various locations while coercing her to engage in sexual acts, and concluded the incident by using a tissue or napkin to either clean himself or the victim. *Id.* Also, both incidents involved women who had previously had intimate relationships with the defendant. *Id.*

Courts find adequate similarity under 90.404(2)(c) when the defendant's conduct conforms to an identifiable pattern. *See, e.g., Bruce*

8

*v. State*, 44 So. 3d 1225, 1229 (Fla. 5th DCA 2010) ("The victim's and [witness's] testimony demonstrated a clear pattern of conduct."). In *Bruce*, the court pointed to the numerous and specific similarities present in both instances in holding that the collateral evidence was admissible. *See id.* The victims were both women of the same age, the defendant knew both women from church, and he knew both were single and lived alone. *Id.* The defendant befriended the women by performing handyman services and commiserating with each about the hardship of caring for a loved one with disabilities. *Id.* During the course of performing handyman services, he not only made sexual advances but fondled the breasts of each. *Id.* Afterwards, he called both women expressing his love, then anger when they rejected his advances. *Id.* The court noted that the only difference was that the defendant successfully completed the sexual battery against the victim but was unable to with the collateral act witness. *Id.*

Similarly, in *Wade v. State*, 265 So. 3d 677 (Fla. 1st DCA 2019), the court found two prior acts similar to the charged crime, where in all three instances the defendant approached the victims on a bicycle, threatened them with a knife, and forced them to have sex with him. In *Mann v. State*, 281 So. 3d 503 (Fla. 4th DCA 2019), the court found the prior act was sufficiently similar where both victims testified that the defendant kidnapped then raped them, and where the crimes took place within one month of each other. In *Pitts v. State*, 263 So. 3d 834, 840 (Fla. 1st DCA 2019), the court held that collateral crime evidence was admissible where in both acts, the defendant was accused of digitally penetrating a female victim while she was sleeping or passed out following a night of drinking.

Here, the charged crimes were similar to that in *Pitts*, but the collateral evidence involved a different criminal act. There is no clear pattern of conduct between the charged crimes and the collateral act. The attack on the *Williams* rule witness on a bench in a public place is only minimally probative of the charged crime—repeated sexual batteries against a passed-out woman on a couch in a residential living room. As the supreme court observed in *McLean*, the less similar the prior acts are to the charged crime, the less relevant they are to that crime. 934 So. 2d at 1259.

In this case, there are some similarities between the charged crimes and the collateral conduct; both cases involved the consumption of alcohol on Clematis Street and an accuser who socialized with the Reynas. However, these similarities are outweighed by the differences between the two crimes, so there is no clear pattern of sexual misconduct:

- The victim was a close friend of the Reynas who regularly slept over at their home; the *Williams* rule witness was a

9

casual acquaintance who socialized occasionally with the Reynas.

- The charged crimes occurred on a couch in a private living room; the collateral act occurred on a public bench in an alley.

- The victim had a work relationship with the Reynas; the *Williams* rule witness had no such work relationship.

- The charged crimes were three sexual batteries that occurred over an extended period of time, with the attack occurring as the victim hovered between consciousness and sleep; the *Williams* rule witness was very much awake during the collateral act, a sudden groping of her genital area.[2]

- There was a gap of over four years between the two incidents.

Because of the significant disparities between the charged crimes and the collateral act, that act is only weakly probative of the charged crimes.[3] As the supreme court observed in *McLean*, where a collateral crime is so minimally probative, it is "more likely that the probative value of this evidence will be 'substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence'" under section 90.403. 934 So. 2d at 1259. Moreover, in this case, the fact that the *Williams* rule witness was a detective in a sex crimes unit carried an additional risk of undue prejudice in a section 90.403 analysis, as juries often afford great weight to the testimony of police officers. *See, e.g., Salomon v. State*, 267 So. 3d 25, 32 (Fla. 4th DCA 2019) (explaining that police officers "bring with their testimony an air of authority and legitimacy," and that a jury "is inclined to give great weight" to such testimony).

---

[2] We do not blame the victim here. We are simply analyzing the manner in which the acts were committed, as the law requires us to do under *McLean*.

[3] The dissent dismisses significant differences between the charged acts and the collateral act as "immaterial." However, the dissent's view of similarity would open the door too wide under section 90.404(2)(c)—any collateral act of sexual battery would be admissible as *Williams* rule evidence in the prosecution of the charged act, so long as both acts involved alcohol and an opportunity that arose when the defendant was alone with the accuser.

Without the collateral evidence, the jury faced a difficult question in this case—what to make of testimony of the two primary actors who had consumed such large amounts of alcohol that their memories of the crucial night were dim? In such a circumstance, evidence of the prior, dissimilar conduct smoothed over the difficulties in the state's case. In applying section 90.404(2)(c), trial courts are gatekeepers in ensuring that evidence of prior acts of sexual misconduct do not unfairly prejudice a defendant or mislead the jury. Here, the trial court abused its discretion in admitting the *Williams* rule witness's testimony. Without adherence to the *McLean* requirement of significant similarity, trials of sexual offenses would too often descend into character assassination by the introduction of marginally similar bad acts.

The dissent uses a buffet approach to the law of evidence by combining distinct portions of the evidence code to buttress its case for admissibility. The dissent suggests that the collateral crime evidence was admissible to prove the "absence of mistake," a consideration under subsection 90.404(2)(a). However, mistake is not a defense to sexual battery—a defendant cannot avoid criminal responsibility for attacking the victim by saying that he thought he was having consensual sex with his wife.

Under subsection 90.404(2)(a), collateral crime evidence is admissible only "when relevant to prove a material fact in issue." "State of mind is not a material fact in a sexual battery charge, nor is intent an issue." *Coler v. State*, 418 So. 2d 238, 239 (Fla. 1982). As the Florida Supreme Court has explained, "in rape prosecutions, it is clear that while a general intent is involved in the crime, no specific intent is requisite other than that evidenced by the doing of the acts constituting the offense." *Askew v. State*, 118 So. 2d 219, 222 (Fla. 1960). Whether appellant knew the identity of the victim he attacked was not a material fact in issue in this case, so the collateral crime evidence was not admissible to prove an absence of mistake or accident under subsection 90.404(2)(a). *See Hebel v. State*, 765 So. 2d 143, 144 (Fla. 2d DCA 2000) (in case involving defendant's sexual battery of "his then spouse," evidence of other crimes held inadmissible to prove the defendant's state of mind); *Killian v. State*, 730 So. 2d 360, 362 (Fla. 2d DCA 1999) (in prosecution for sexual battery of a child, holding that the state's introduction of "dirty" books in the defendant's possession to show his state of mind and intent "was improper because state of mind is not a material fact in a sexual battery case and intent is not an issue"); *Williams v. State*, 619 So. 2d 487, 493 (Fla. 1st DCA 1993) (holding that where the state sought to admit evidence of other crimes to prove "absence of mistake or accident," such evidence was

inadmissible where "there was no material issue of fact relating to either of these facts").

Finally, the dissent underplays the impact of the collateral crime evidence by stating that the testimony "took up only ninety minutes" of witness testimony. The prosecutor emphasized the collateral crime evidence in closing argument to argue that appellant had the propensity to commit the charged crimes. For example, the prosecutor argued:

> What we're saying is we know that Jose Reyna, when presented with the opportunity of a woman who is intoxicated, who . . . is maybe a little disoriented, when is alone with her away from his wife, he will take the opportunity to do something to her without her consent. And it's a sexual act.

> ***

> All of the evidence points to one conclusion. There is the testimony of [the victim]. The defendant on the controlled call supports what she sa[id] happened. The testimony of [the *Williams* rule witness]. This is not some mistake. This is not some confusion. This is what he does.

On the remaining issue, we hold that the trial judge did not abuse her discretion in allowing appellant's prior convictions to be used for impeachment.

*Reversed and remanded for a new trial.*

WARNER, J., concurs.
GERBER, J., concurs in part and dissents in part with opinion.

GERBER, J., concurring in part and dissenting in part.

I respectfully dissent from the majority's holding that the trial court abused its discretion by admitting evidence of appellant having committed a sexual battery upon the *Williams* rule witness. My dissenting opinion will be presented in two sections: (1) the state properly relied upon the *Williams* rule sexual battery to prove the instant sexual battery; and (2) the similarities between appellant's sexual battery of the instant victim and the *Williams* rule witness are not outweighed by the differences between the two crimes.

### 1. The state properly relied upon the Williams *rule*

12

### *sexual battery to prove the instant sexual battery.*

In the second controlled phone call between appellant and the victim in the instant case, the victim confronted appellant for having kissed her, licking her chest, putting his hands down her pants, performing oral sex on her, and raping her. Appellant responded:

> Honey, I am so sorry. Please, I'm so sorry. *I didn't -- I didn't mean to touch you. I was thinking maybe that you was [my wife] maybe, I don't know.* I'm so sorry. I apologize, I'm so sorry. Please. Please, I am so sorry. I'm trying to remember.

(emphasis added).

Based on appellant's statement, the state filed its notice of its intent to offer *Williams* rule evidence pursuant to section 90.404(2)(c)1., Florida Statutes (2015), to show that appellant's sexual battery of the victim was not an innocent mistake of thinking he was having consensual sexual relations with his wife. Specifically, the state alleged:

> According to [the *Williams* rule witness], she met the defendant through his wife. On the date of the sexual battery, [the *Williams* rule witness] was hanging out with the defendant and his wife. While at a club in downtown West Palm Beach, the Defendant pushed [the *Williams* rule witness] through a door. The Defendant became aggressive and ripped her stockings and penetrated her vagina with his fingers. *This evidence is relevant to issues of ... motive, intent, to show absence of mistake, and to show the defendant's sexual interest in women he meets through his wife.*

(emphasis added).

Although the state's *Williams* rule notice expressly referred to section 90.404(2)(c)1., which provides that evidence of the defendant's other sexual offenses are "admissible and may be considered for its bearing on *any matter* to which it is relevant" (emphasis added), the state went a step further by specifically identifying the material facts upon which the *Williams* rule evidence was relevant, that is, to prove appellant's motive, intent, and absence of mistake, as permitted under the narrower section 90.404(2)(a).

The probative value of this *Williams* rule evidence was not substantially outweighed by the danger of unfair prejudice to appellant, based on the

non-exclusive *McLean* factors. The manner in which the acts were committed were extremely similar:

- Both the *Williams* rule witness and the instant victim were single adult females. The instant victim was thirty-seven years old at the time of the act charged. Although the *Williams* rule witness was never asked her age, other contextual clues in her testimony (years of work experience) suggest she was also in her thirties when the prior sexual battery occurred.

- Both the *Williams* rule witness and the instant victim had become friends with appellant's wife and had socialized with appellant and his wife at their home.

- Both the night of the prior sexual battery and the night of the instant sexual battery began with the *Williams* rule witness and the instant victim drinking at the Reynas' home.

- Both nights continued with the *Williams* rule witness and the instant victim going out with appellant and his wife for drinking and dancing at bars within the downtown West Palm Beach entertainment district.

- Both the *Williams* rule witness and the instant victim became very impaired while drinking at the downtown bars.

- Both the prior sexual battery and the instant sexual battery occurred in locations where no one else was present – the prior sexual battery occurred in a dark deserted alley, and the instant sexual battery occurred in appellant's living room after appellant's wife had gone to bed.

- Appellant's first physical contact with both the *Williams* rule witness and the instant victim was kissing them on the mouth.

- Both the *Williams* rule witness and the instant victim reminded appellant he was married and attempted to physically resist him (the *Williams* rule witness tried to push appellant away, and the instant victim "swatted" at appellant), but appellant continued his sexual battery.

- Appellant physically got on top of both the *Williams* rule witness and the instant victim.

- Appellant reached through the clothes of both the *Williams* rule witness and the instant victim to penetrate their vaginas with his fingers.

The state properly relied upon the foregoing similarities to prove appellant's sexual battery of the instant victim was, beyond a reasonable doubt, not an innocent mistake of thinking he was having consensual sexual relations with his wife.  The foregoing similarities further proved, beyond a reasonable doubt, appellant's motive and intent of committing sexual battery upon his wife's very impaired friends if an opportunity arose when he was alone with the women long enough to commit the sexual battery.

This conclusion is consistent with other cases in which our sister courts have admitted *Williams* rule evidence to prove a defendant's modus operandi of taking advantage of a relationship to commit sexual battery. *See Pitts v. State*, 263 So. 3d 834, 837-39 (Fla. 1st DCA 2019) (evidence that defendant had years earlier penetrated a woman after she passed out following a night of drinking was admissible to prove the present sexual battery of another woman who was sleeping after a night of drinking); *Bruce v. State*, 44 So. 3d 1225, 1229 (Fla. 5th DCA 2010) ("The victim's and [the *Williams* rule witness's] testimony demonstrated a clear pattern of conduct.  The women were the same age, Bruce knew both women from church, and he knew both were single and lived alone.  Bruce first befriended the women by performing handyman services and commiserating with each about the hardship of caring for a loved one with disabilities.  During the course of performing handyman services, he not only made sexual advances but fondled the breasts of each. The only difference was that he successfully completed the sexual battery against the victim, but was unable to [complete the sexual battery with the *Williams* rule witness who fought him off].").

### 2. The similarities between appellant's sexual battery of the instant victim and the Williams *rule witness* <u>are not outweighed by the differences between the two crimes.</u>

The majority cites five differences between appellant's sexual battery of the instant victim and the *Williams* rule witness to justify its ultimate conclusions that the prior sexual battery was "only weakly probative of the charged crimes" and thus "the trial court abused its discretion in admitting the *Williams* rule witness's testimony."  Maj. op. at 10.  As discussed below, each of those five differences are either factually or legally mistaken or immaterial.

15

- *"The victim was a close friend of the Reynas who regularly slept over at their home; the* Williams *rule witness was a casual acquaintance who socialized occasionally with the Reynas."*

In actuality, the *Williams* rule witness was more than a casual acquaintance. Although she had not slept over at the Reynas' home, she had been to the Reynas' home a few times and *was a guest at the Reynas' wedding.* Thus, like the instant victim, the *Williams* rule witness's relationship was close enough that she was invited to the Reynas' home to begin a night of drinking, and then accompanied them to downtown bars for a night of dancing and more drinking. When she became very impaired, and no one else was present in the dark deserted alley, appellant took advantage of the opportunity to commit a sexual battery upon her, just as he did with the instant victim, another close friend, at the Reynas' home. Thus, the *Williams* rule evidence corroborated appellant's motive, intent, and absence of mistake in committing the sexual battery upon the instant victim.

- *"The charged crimes occurred on a couch in a private living room; the collateral act occurred on a public bench in an alley."*

This difference is immaterial. Appellant's motive and intent was to commit sexual battery upon his wife's friends *when the opportunity presented itself,* that is, when his wife's friends became very impaired and no one else was present, *regardless of location.* Thus, appellant took advantage of the dark deserted alley to commit a sexual battery upon the impaired *Williams* rule witness, and later took advantage of the impaired instant victim in his living room with while his wife slept in their bedroom.

- *"The victim had a work relationship with appellant's wife; the* Williams *rule witness had no such work relationship."*

This difference is immaterial. As stated above, the *Williams* rule witness's relationship was close enough that she had been to the Reynas' home a few times, socialized with them, and had been a guest at the Reynas' wedding.

Also immaterial is the fact that the *Williams* rule witness was a detective in a sex crimes unit. The majority argues that fact carried an additional risk of undue prejudice in a section 90.403 analysis, as juries often afford great weight to the testimony of police officers. *See, e.g., Salomon v. State,* 267 So. 3d 25, 32 (Fla. 4th DCA 2019) (explaining that police officers "bring with their testimony an air of authority and legitimacy," and that a jury "is

16

inclined to give great weight" to such testimony). However, detectives in sex crimes units can become sexual battery victims too, and should not be excluded as possible *Williams* rule witnesses on that basis. Here, the *Williams* rule witness's only role was being another of appellant's wife's very impaired friends whom appellant sexually attacked when the opportunity presented itself, just as he did to the instant victim.

- *"The charged crimes were three sexual batteries that occurred over an extended period of time, as the victim hovered between consciousness and sleep; the* Williams *rule witness was very much awake during the collateral act, a sudden groping of her genital area."*

This difference is immaterial. The only reason why "three sexual batteries … occurred over an extended period of time" to the instant victim as she "hovered between consciousness and sleep," is because she was so much more impaired than the *Williams* rule witness, who was able to fight back and get away. *Cf. Bruce*, 44 So. 3d at 1229 (the fact that the defendant successfully completed the sexual battery against the victim, but was only able to fondle the *Williams* rule witness's breasts, was an insignificant difference, because the *Williams* rule witness was able to fight off the defendant before he could complete the sexual battery).

That is why the majority's attempt to distinguish the striking similarities between the instant case and *Pitts v. State*, 263 So. 3d 834 (Fla. 1st DCA 2019), is ill-conceived. As stated above, in *Pitts*, our sister court held that *Williams* rule evidence from years earlier was admissible where in both acts, the defendant was accused of digitally penetrating a female victim while she was sleeping or passed out following a night of drinking. *Id.* at 837-39. Like the *Williams* rule notice in the instant case, the *Pitts* notice had stated this collateral crime evidence would be introduced "pursuant to Florida Statute 90.404(2) for purposes of proving a material fact in issue: specifically the requisite elements of intent (including absence of mistake or accident), modus operandi." *Id.* at 837 (internal brackets and quotation marks omitted).

Despite those striking similarities to the instant case, the majority attempts to distinguish *Pitts* as follows:

> Here, the charged crimes were similar to that in *Pitts*, but the collateral evidence involved a different criminal act. There is no clear pattern of conduct between the charged crimes and the collateral act. *Groping a woman on a bench in a public place is only minimally probative of the charged crime—*

*repeated sexual batteries against a passed-out woman on a couch in a residential living room.*

Maj. op. at 9 (emphasis added). The majority's reasoning is unfortunately misguided. The only reason why the *Williams* rule witness was not also the victim of "repeated sexual batteries" is because she was less impaired than the instant victim, and thus more able to fight back and get away. Thus, the majority ultimately understates the facts by claiming appellant was merely "groping a woman on a bench in a public place." In actuality, appellant was taking advantage of being with the impaired *Williams* rule witness in a dark deserted alley so he could attempt to rape her, just as he was later able to rape the more severely impaired instant victim in his living room when no one else was present.

- *"There was a gap of over four years between the two incidents."*

I recognize the *McLean* court identified "the closeness in time of the prior acts to the act charged" as one of the factors which a trial court should evaluate when determining whether the probative value of previous offenses is substantially outweighed by the danger of unfair prejudice. 934 So. 2d at 1262. However, I do not consider "a gap of over four years between the two incidents" to be material in this case, for three reasons.

First, as mentioned above, in *Pitts*, our sister court held that evidence that defendant had "years earlier" penetrated a woman after she passed out following a night of drinking was admissible to prove the present sexual battery of another woman who was sleeping after a night of drinking. 263 So. 3d at 837.

Second, permitting the state to have presented *Williams* rule evidence from "years earlier" is consistent with section 90.610(1), Florida Statutes (2015), which permits a witness's credibility to be impeached by prior convictions for felonies and crimes of dishonesty going back many years, if appropriate. *See Peoples v. State*, 576 So. 2d 783, 789 (Fla. 5th DCA 1991) (noting that, although section 90.610(1)(a), "precludes evidence in a civil trial of a conviction so remote in time as to have no bearing on the present character of a witness," section 90.610(1) does not otherwise prohibit such evidence in a criminal trial). As our sister court stated in *Nehring v. State*, 225 So. 3d 916 (Fla. 1st DCA 2017):

> The only test for the admissibility of a prior conviction is whether the conviction has any bearing on the witness's credibility. The remoteness of the conviction will most certainly be a factor in determining whether it bears on the

18

witness's credibility, but *there is no bright-line rule for when a conviction becomes too remote to bear on the witness's credibility. The determination is within the trial court's discretion, and a trial court abuses its discretion only when its decision is arbitrary or fanciful.*

*Id.* at 918 (emphasis added; internal citation omitted). Given that a trial court's section 90.404(2) determination has similar considerations to a section 90.610(1) determination, no reason exists here why "a gap of over four years between the two incidents" should be material in this case.

Third, and most importantly, the method by which appellant committed the sexual batteries against the *Williams* rule witness and the instant victim was partially based on factors beyond appellant's control and partially based on opportunity, the combination of which may have required years to develop before appellant could offend again. Appellant's modus operandi required four events to occur: (1) his wife would have to become friends with another woman, (2) that relationship would have to develop to the point when the woman would socialize often with the Reynas, (3) an occasion would have to occur when the woman would drink to the point of impairment, and (4) an opportunity would have to occur when the woman was with appellant in a location where no one else would be present for several minutes, if not more, so appellant could take advantage of the woman. Given that this combination of factors may have required years to occur, the fact that at least two incidents occurred just over four years apart should not be surprising. *Cf. LaValley v. State*, 30 So. 3d 513, 515-16 (Fla. 5th DCA 2009) (trial court did not abuse its discretion by allowing *Williams* rule evidence of another familial molestation occurring eleven years earlier; "[A]lthough the molestations occurred years apart, that appears more to be a function of opportunity than anything else.").

### *Conclusion*

Based on the foregoing, I respectfully dissent from the majority's holding that the trial court abused its discretion by admitting evidence of appellant having committed a sexual battery upon the *Williams* rule witness. *See Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980) ("Discretion … is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where *no reasonable* [*person*] *would take the view adopted by the trial court.*") (emphasis added).

I also note the trial court read the cautionary *Williams* rule instruction, that is, Florida Standard Jury Instruction (Criminal) 2.4, to the jury before the *Williams* rule witness's testimony. Further, this evidence did not become a feature of the lengthy trial or overwhelm evidence of the charged crime. The *Williams* rule witness and her mother were the last two out of ten state witnesses to testify, and their testimony took up only ninety minutes out of three full days' of witness testimony in the trial as a whole. During the state's one hour closing argument, the state discussed the *Williams* rule evidence for only three to four minutes. *See Stubbs v. State*, 275 So. 3d 631, 636 (Fla. 4th DCA 2019) ("On this record, the collateral act evidence did not become a feature of the trial or overwhelm the evidence of the charged crime.").

Lastly, and without further discussion, I concur with the majority's holding that the trial court did not abuse its discretion in allowing appellant's prior convictions to be used for impeachment.

*　　*　　*

***Not final until disposition of timely filed motion for rehearing.***